<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| DAVID TERRELL STARR, : | |
| : | Civil Action No. 12-0543(DRD) |
| Petitioner, : | |
| : | |
| v. : | **OPINION** |
| : | |
| CHARLES WARREN, et al., : | |
| : | |
| Respondents. : | |
| : | |

---

**APPEARANCES:**

David Terrell Starr
New Jersey State Prison
P.O. Box 861
Trenton, NJ  08625
    Petitioner <u>pro</u> <u>se</u>

Sara B. Liebman
Special Deputy Attorney General/
    Acting Assistant Prosecutor
Union County Prosecutor's Office
32 Rahway Avenue
Elizabeth, NJ  07202
    Counsel for Respondents

**DEBEVOISE**, District Judge

    Petitioner David Terrell Starr, a prisoner currently confined at New Jersey State Prison, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction and sentence for murder and related

offenses.  The respondents are Administrator Charles Warren and the Attorney General of New Jersey.

For the reasons stated herein, the Petition shall be denied.

## I.  BACKGROUND

### A.  Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> We briefly summarize the key evidence presented at trial. On March 14, 2003, at approximately 7:05 a.m., Officer Sean McGuire (McGuire) of the Plainfield Police Department (PPD) was dispatched to a residence on Evona Avenue based on a report that a man was bleeding from the head. McGuire entered the residence and was directed to the basement, where he observed L.J. laying on a mattress in the rear of the basement. L.J. was alive, but his heart rate was rapid and breathing labored.
>
> McGuire immediately called for the rescue squad, which responded to the scene and attempted to perform medical treatment upon the victim. L.J. was pronounced dead at 7:43 a.m. He was fifteen years old at the time. McGuire testified that, while in the basement of the Evona Avenue residence, he observed a plastic bag containing suspected crack cocaine on an "entertainment center" that held a television.
>
> Dr. Leonard Zaretski (Zaretski) performed an autopsy on L.J.'s body the following day. Zaretski

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

testified that L.J. died as a result of two gunshot wounds to the head. Detective Michael Sandford of the Union County Police Department testified that the bullets removed from L.J.'s body were .32 caliber projectiles, and were fired from the same weapon. Officer Glenn Trescott (Trescott) of the PPD testified that he found .32 caliber ammunition behind an air duct in the basement of the residence. He also found a .45 caliber handgun, a 9 millimeter handgun, suspected cocaine, and twenty three bags of marijuana.

T.J. is L.J.'s mother. T.J. testified that in March 2003, she was living in the residence on Evona Avenue with L.J., her daughters S.T.J., S.I.J., and S.A.J., and another son, K.J. T.J. testified that L.J. slept in the finished basement of the house.

T.J. stated that on the morning of March 14, 2003, she asked S.I.J. to go and wake L.J. S.I.J. returned with a paper towel full of blood and said that L.J. would not wake up. T.J. went to the basement. She shook L.J. and lifted his arms. He gasped for air but did not verbally respond. T.J. called the police.

T.J. stated that defendant was L.J.'s cousin. Defendant slept in her home during the evening of March 13, 2003. K.C., to whom T.J. referred as her "godbrother," also stayed in the house that night. K.C. slept in the living room on the first floor.

T.J. said that the stairway from the first floor was the only way to gain access to the basement. There was a window in the basement but the window was screwed shut. T.J. also said that there were two entrances on the first floor of the house. The front door had two locks, one of which was a dead bolt lock. The back door had similar locks. In addition, T.J. had a dog that was free to roam around the house. According to T.J., the dog did not take "kindly" to strangers.

T.J. testified that on the night before L.J. was killed, she heard defendant ask L.J. if he could wear one of his outfits. L.J. refused. T.J. said that L.J. owned a brown sweat suit. L.J. also owned diamond earrings. In addition, he had a long chain and

medallion with diamonds. T.J. additionally testified that on the morning of March 14, 2003, she heard gunshots at around 6:30 a.m. T.J. said that she was awake at the time, sitting on her bed, watching the news on television.

L.J.'s sister S.I.J. testified that on March 13, 2003, defendant was staying in L.J.'s room in the basement of the house. Sometime during the day, S.I.J. went down to the basement. L.J. had gone out and defendant was there with S.I.J.'s other brother, K.J. S.I.J. saw K.J. reach under a pillow on a couch and pull out a gun. She also observed defendant walk over to L.J.'s cabinet, pull out a "little gun" and point it at K.J. S.I.J. went upstairs to the second floor and, at some point, went to sleep.

S.I.J. testified that the following morning, she awoke around 6:00 a.m. and heard sounds "like a firecracker." S.I.J. heard two sounds, minutes apart. She said that the sounds were coming from beneath her. S.I.J. observed defendant coming up the stairs. Defendant gave S.I.J. a "high-five" and he went into the bathroom. About ten minutes later, S.I.J. went down to wake L.J.

On the first floor, S.I.J. noticed that the front door was unlocked. K.C. was asleep. S.I.J. went down to the basement. She saw L.J. lying on a mattress on the floor. He had a cover over his face. S.I.J. pulled the cover back and told L.J. to wake up. L.J. did not awaken and S.I.J. started to shake him. She then observed blood.

K.C. testified that he was staying at the T.J.'s residence on the night of March 13, 2003. K.C. said that he arrived at the house between 8:00 and 8:30 p.m. and defendant answered the door. K.C. never met defendant before. K.C. entered the house and T.J. arrived about fifteen minutes later.

K.C. stated that L.J. was in the house. K.C. was present when defendant asked L.J. if he could wear his sweat suit and boots and L.J. refused. K.C. said that defendant seemed "a little bit aggravated." L.J. and defendant left the house together but later, defendant returned without L.J.

4

K.C. testified that afterwards, L.J. returned home. K.C. was in the living room on the first floor. L.J. showed K.C. "a big handful of money" and went downstairs to the basement. K.C. remained upstairs and slept on the couch. Sometime between 2:30 and 3:30 a.m., a man came to the door. K.C. said that the man identified himself as C.J., T.J. "or something to that effect." The man asked to come in and said that he needed to speak to L.J.

K.C. went to the basement, woke L.J. and asked if he knew the person at the door. L.J. said that he did. K.C. went upstairs, let the man into the house, and took him downstairs. L.J. and the man spoke briefly. According to K.C., defendant was asleep in the basement and did not wake up. The man left and K.C. locked the door.

K.C. stated that while he was in the basement, he did not see anyone shoot L.J. He also said that, to the best of his knowledge, no one came into the house at any time after that. [K.C.] woke the following morning when S.I.J. came downstairs, opened the front door, and went into the basement to wake L.J.

L.J.'s sister S.T.J. testified that defendant was at T.J.'s residence on the evening of March 13, 2003. That evening, S.T.J. saw defendant standing at the top of the stairway on the second floor with a black handgun in his waistband. Defendant said something about leaving and going to Virginia. S.T.J. went to sleep about 11:00 p.m. and woke around 6:30 a.m. the following day.

S.T.J. recalled hearing two "loud bangs." She heard the first sound shortly after she woke up, when she was on her way upstairs to the third floor. S.T.J. was on her way down from the third floor when she heard the second sound. S.T.J. thought the sounds came from downstairs. After she heard the two "bangs," S.T.J. saw her sister, S.I.J. She was wearing plastic gloves and was holding bloody paper towels. S.I.J. told her that L.J. was downstairs and he was lying in "two piles of blood."

5

S.C. lived next door to the T.J.'s home. She knew
L.J. for about four years and said he was her "best
friend." S.C. met defendant for the first time in the
morning on March 13, 2003. Later that day, S.C. was in
the basement of T.J.'s home with L.J. and defendant.
She said that L.J. was counting money and he was
"about to chop some drugs up."

She testified that she counted a total of $7,800.
She put about $4,000 in a vent, $1,300 in a coat, and
L.J. took the remainder. L.J. put some of the drugs in
a plastic bag and placed the bag on top of the vent.
Drugs also were placed behind the sofa. S.C. said that
there was a shotgun behind the sofa and two guns were
underneath the entertainment system. Another gun was
broken but defendant fixed it and he handed it to
S.C.. She placed the gun on top of the vent.

In the morning of March 14, 2003, S.C. saw the
ambulance and police at L.J.'s house. She tried
calling L.J. on his cell phone but he did not answer.
Later that day, S.C. saw defendant at the police
precinct. He was wearing a brown outfit that belonged
to L.J. S.C. said that L.J. had two diamond earrings,
a pinky ring, and a chain with a pendant with two
praying hands. S.C. said that L.J. never loaned his
clothes or jewelry to anyone.

S.C. testified that after L.J. was killed, she
returned to his room with the police to show them
where the drugs, money and guns were. Some of the
money was missing. The police found some of the drugs
that were placed on top of the vent. They also found
the guns under the entertainment center but did not
find the shotgun behind the couch or the gun on top of
the vent.

Tammy Green (Ms. Green) is T.J.'s cousin.
Defendant is also her cousin and he would occasionally
stay at her house. Defendant came to Ms. Green's home
at about 7:45 a.m. or 8:00 a.m. on March 14, 2003.
Defendant was wearing L.J.'s brown velour sweat suit.
Defendant also was wearing L.J.'s gold chain. Ms.
Green said that defendant took off the chain and
placed it on the dining room table.

Ms. Green said that defendant went to the door because his sister Vanessa was outside screaming. Ms. Green let Vanessa into the house. According to Ms. Green, Vanessa was "hysterical, [and] freaked out." Vanessa said that L.J. was dead. Defendant was standing next to Vanessa. Ms. Green said that defendant displayed "no type of feeling, or anything at all."

Ms. Green traveled to Plainfield in a car with defendant and others. They stopped at a convenience store because defendant said that he "needed to get" a Pepsi. Defendant went into the store and came out with a bottle of Pepsi. Ms. Green said defendant "kind of like washed his hands with it." Later, Ms. Green told defendant that she heard people saying that he killed L.J. Defendant replied that this was "bull shit." Referring to L.J., defendant stated that "when he left, that mother fucker was alive."

Markell Green (Mr. Green) testified that, at the time of L.J.'s death, he was living with his sister, Tammy. Mr. Green said that defendant came to the house on the morning of March 14, 2004. He was wearing a rust-colored sweat suit and a chain with diamonds. Defendant's sister arrived and she was screaming. Defendant placed the chain on the table. Calls about L.J. started coming in. Mr. Green asked defendant where he got the chain, and defendant said that he and L.J. "went shooting in the Projects early in the morning" and some persons "started dropping things."

Mr. Green went with his sister, defendant and others to Plainfield. Mr. Green recounted that they stopped at a store where defendant purchased a Pepsi. Defendant did not drink any of the soda but used it to wipe off his skin from the arms down. According to Mr. Green, defendant said that he was rubbing the Pepsi on his hands because he had been "shooting in the Projects earlier that morning." According to Mr. Green, when they arrived at T.J.'s residence, defendant asserted that "C.J. did it."

Peter Martin (Martin) was incarcerated in the Union County jail in March and April of 2003. Martin met defendant in the special housing unit of the jail. Defendant told Martin that he shot L.J. twice in the

back of the head while L.J. was sleeping. Defendant
said that he used L.J.'s .32 caliber weapon. Defendant
told Martin that after the shooting, he removed his
clothes, changed into L.J.'s sweat suit, took a gold
chain and money, boarded a bus to Newark and later
took a taxi to Ms. Green's house in East Orange.
Defendant said that he needed the money and had to go
to Virginia because his girlfriend was going to have
his baby the following month. Defendant told Martin
that "he washed his hands off with Pepsi to get the
gunpowder off." Defendant also told Martin that he had
taken L.J.'s necklace.

Defendant did not testify and called no witnesses
to testify on his behalf.

State v. Starr, No. A-15891589-05T4-05, 2007 WL 2935055, *1-*5

(N.J. Super. App. Div. Oct. 9, 2007).

B.   Procedural History

Petitioner was charged under a Union County indictment with

murder, N.J.S.A. 2C:11-3a(1) and/or (2) (count one); felony

murder, N.J.S.A. 2C:11-3a(3) (count two); robbery, N.J.S.A.

2C:15-1 (count three); unlawful possession of a firearm,

N.J.S.A. 2C:58-4 (count four); and possession of a weapon for an

unlawful purpose, N.J.S.A. 2C:39-4a (count five).  Following a

jury trial, Petitioner was convicted of all charges.

Petitioner was sentenced on July 29, 2005.  (Answer, Ex. 1

at Da4-Da5; Ex. Ra22.)  Having found several aggravating

factors, and no mitigating factors, the judge imposed a 60-year

term of imprisonment on the murder charge, subject to the 85

percent parole disqualifier as prescribed by the New Jersey No

Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.  The trial court

imposed the same sentence for the felony murder conviction, to run concurrently to the sentence on the murder conviction, and then merged the remaining counts, imposing a four-year sentence, concurrent to the murder sentence.

On direct appeal, the New Jersey Court of Appeals affirmed the convictions, but vacated certain aspects of Petitioner's sentences on counts two, three, and five, which it found were not correctly merged, and remanded for entry of a corrected judgment.  State v. Starr, 2007 WL 2935055.  On January 24, 2008, the Supreme Court of New Jersey denied certification.  State v. Starr, 193 N.J. 587 (2008).  Petitioner did not seek a writ of certiorari from the United States Supreme Court.

On August 5, 2008, Petitioner filed his state petition for post-conviction relief (the "PCR petition").  After oral argument, but without an evidentiary hearing, the trial court denied post-conviction relief, which the Appellate Division affirmed on March 30, 2011.  State v. Starr, 2011 WL 1135116 (N.J. Super. App. Div. March 30, 2011); (Answer, Doc. No. 16, Ex. 7, Defendant's Brief on Appeal, at Da68, Order denying post-conviction relief, April, 27, 2009).  On September 22, 2011, the Supreme Court of New Jersey denied certification.  State v. Starr, 208 N.J. 339 (2011).

This Petition timely followed.  Here, Petitioner asserts the following grounds for relief:  (1) that his right to a fair

trial was prejudiced by the prosecutor's misuse of Dr. Bakowska's expert testimony, (2) that the trial court's ruling precluding him from presenting proof of L.J.'s gang involvement, to show that third-party guilt, deprived him of his rights under the Fifth, Sixth, and Fourteenth Amendments, (3) that the aggregate 60-year sentence imposed was manifestly excessive, constituted an abuse of judicial discretion, and violated State v. Natale, 184 N.J. 458 (2005),[1] and (4) that the prosecutor's summation violated Petitioner's right to a fair trial. Respondents timely answered.  This Court granted Petitioner leave to reply, including an extension of time to reply. Petitioner has not filed a reply.

On or about November 20, 2013, after the Respondents filed their Answer, Petitioner sent a Letter [20] to the Court, explaining that he had stapled to the Petition a claim for ineffective assistance of counsel, that was not addressed in the Respondents' Answer, and asking the Court to allow him to raise the ineffective assistance of counsel issue.  Respondents have not responded to Petitioner's letter.

Briefing is complete and this matter is ready for decision.

---

[1] In State v. Natale, the Supreme Court of New Jersey held that the imposition of "a sentence above the presumptive statutory term based solely on a judicial finding of aggravating factors, other than a prior criminal conviction, violates a defendant's Sixth Amendment jury trial guarantee."  184 N.J. at 466 (applying Blakely v. Washington, 542 U.S. 296 (2004)).

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000)

(O'Connor, J., for the Court, Part II), cited in Ely v. Erickson, 712 F.3d 837 (3d Cir. 2013).

A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. See also Moore v. DiGuglielmo, No. 09-2189, 489 F.App'x 618, 624 n.2 (3d Cir. 2012) (noting the same). To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Williams, 529 U.S. at 409. "This standard ... is 'difficult to meet': To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013) (quoting Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011)). In determining whether the state court's

application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts.  Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999), cited in Glenn v. Wynder, No. 12-4333, 2014 WL 642947, *5 n.6 (3d Cir. Feb. 20, 2014) and Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)), cited in Wright v. Vaughn, 473 F.3d 85, 91 (3d Cir. 2006).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Holloway v. Horn, 355 F.3d 707, 718 (3d Cir. 2004); Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001).  In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)); Collins v. Secretary of Pennsylvania Dept. of Corrections, 742 F.3d 528, 544 and n.9 (2014) (citing Appel).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed

correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d 158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 397-98 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   Expert Testimony

Petitioner contends that he was deprived of his right to a fair trial by the admission of the expert testimony of Dr. Elzbieta Bakowska, because she presented an opinion based on pure speculation, without an adequate factual basis.  On direct

14

appeal, the Appellate Division found that the trial court had

erred in allowing Dr. Bakowska to testify that residue found on

Petitioner's hand "could" be gunshot residue, but found the

error harmless.

     Defendant argues that he was denied his right to
a fair trial by the admission of testimony by Dr.
Elabieta Bakowska (Bakowska).  We disagree.

     Bakowska was qualified to testify as an expert in
the field of elemental analysis and gunshot residue.
Bakowska testified that the presence of antimony,
barium, lead and copper is consistent with gunshot
residue. Bakowska stated that she analyzed certain
samples taken from defendant. She found no antimony,
barium, lead or copper in the swabs of defendant's
left palm and the back of the left hand, but she found
low levels of lead and copper in the swabs of the
right palm and the back of the right hand.

     Bakowska explained that the best time to collect
gunshot residue is "[a]s soon as possible." Gunshot
residue consists of microscopic particles that can be
removed over time. She said that it is "very rare to
find any of the elements characteristic for gunshot
residue [past] four hours of the time of shooting."
Bakowska commented that any washing of the hands will
remove the particles, and Pepsi and other soft drinks
contain phosphoric acid that "help[s] dissolve gunshot
residue particles." Bakowska was asked whether the
lead and copper found on defendant's hand could have
come from gunshot residue. She replied, "It could."

     Defendant argues that Bakowska's testimony was
not relevant. He further contends that, if the
testimony was relevant, it should have been excluded
under N.J.R.E. 403 because its probative value was
outweighed by the risk of undue prejudice. Defendant
additionally argues that the judge erred by failing to
instruct the jurors that they could not infer from
Bakowska's testimony that gunshot residue was, in
fact, found on defendant's hand. These contentions
were not raised at trial. Therefore, we consider
whether the admission of this testimony was erroneous

and, if so, whether it constitutes plain error. R. 2:10-2.

We reject defendant's contention that Dr. Bakowska's testimony was irrelevant. "Relevant evidence" is evidence "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Evidence is relevant when it "renders the desired inference more probable than it would be without the evidence." Verdiccio v. Ricca, 179 N .J. 1, 33 (2004) (quoting State v. Davis, 96 N.J. 611, 619 (1984)). Evidence is considered to be relevant when it supports the existence of a specific fact, "even obliquely." Id. at 34.

Bakowska's testimony established that low levels of lead and copper were found in the samples taken from defendant's hand. Bakowska testified that lead and copper are elements found in gunshot residue. She explained that gunshot residue may dissipate in time, and Pepsi could be used to remove such residue. In our view, Bakowska's testimony on these issues was relevant. Her testimony made it more probable than not that defendant shot L.J. Moreover, we are not convinced that Barkowska's testimony on these isssues should have been excluded pursuant to N.J.R.E. 403. Bakowska's testimony was probative and its probative value was not outweighed by any undue prejudice that might result from its admission.

We agree that Bakowska should not have been permitted to testify that the low level of lead and copper found on defendant's hand "could" be gunshot residue. An expert's opinion must be "framed in terms of probability," not "mere possibility." Scully v. Fitzgerald, 179 N.J. 114, 128 (2004). See also Grzanka v. Pfeifer, 301 N.J.Super. 563, 580 (App. Div. 1997), certif. denied, 154 N.J. 607 (1998) (noting that expert testimony cannot be based on "unfounded speculation and unquantified possibilities"). However, the admission of Bakowska's opinion does not warrant reversal of defendant's conviction. There was overwhelming evidence from which a jury could reasonably find beyond a reasonable doubt that defendant shot and killed L.J. Viewing the record as a whole, the admission of Bakowska's opinion was

erroneous but it was not clearly capable of producing
an unjust result. R. 2:10-2.

State v. Starr, 2007 WL 2935055 at *5-*6.

It is well-established that the violation of a right
created by state law is not cognizable as a basis for federal
habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)
("We have stated many times that 'federal habeas corpus relief
does not lie for errors of state law.'" (quoting Lewis v.
Jeffers, 497 U.S. 764, 680 (1990))); Ross v. District Attorney
of the County of Allegheny, 672 F.3d 198, 207 n.5 (3d Cir. 2012)
(citing Estelle).  Accordingly, Petitioner cannot obtain relief
for the alleged errors in state law evidentiary rulings, unless
they rise to the level of a deprivation of due process.  See
Estelle, 502 U.S. at 70 ("'the Due Process Clause guarantees
fundamental elements of fairness in a criminal trial'") (quoting
Spencer v. Texas, 385 U.S. 554, 563-64 (1967)).

For a habeas petitioner to prevail on a claim that an
evidentiary error amounted to a deprivation of due process, he
must show that the error was so pervasive as to have denied him
a fundamentally fair trial.  Keller v. Larkins, 251 F.3d 408,
413 (3d Cir.), cert. denied, 534 U.S. 973 (2001), cited in Lee
v. Glunt, 667 F.3d 397, 403 (3d Cir. 2012).

Here, this Court agrees with the Appellate Division that,
even if there was an error of state law in admitting the

expert's testimony regarding the possibility that residue on Plaintiff's hands might indicate that he had fired a gun, that error was not so pervasive as to have denied Petitioner a fair trial.  In particular, the Court notes that two other witnesses testified that Petitioner had advised them that he had been shooting that morning and that they witnessed Petitioner attempting to wash away any possible residue.  In light of this testimony, as well as the other substantial evidence of guilt, Petitioner cannot establish that the erroneous admission of the expert's testimony deprived him of a fundamentally fair trial. Petitioner is not entitled to relief on this claim.

B.    Exclusion of Gang Affiliation Evidence

Petitioner contends that the trial court deprived him of a fair trial when it precluded testimony of the victim's gang involvement to show third party guilt.  The Appellate Division rejected this claim on direct appeal.

> We turn to defendant's assertion that the trial judge erred by precluding defendant from eliciting testimony from T.J., S.T.J., and S.C. concerning L.J.'s "gang involvement." Defendant proffered this testimony in order to show possible third-party guilt. After conducting hearings respecting this testimony pursuant to N.J.R.E. 104, the judge ruled that defendant had not established the requisite factual basis to show potential third-party guilt, and precluded defendant from eliciting this testimony.

> "The constitutional right to present a defense confers on the defendant the right to argue that someone else committed the crime." State v. Fortin, 178 N.J. 540, 590 (2004) (citing State v. Jimenez, 175

N.J. 475, 486 (2003), <u>State v. Koedatich</u>, 112 N.J. 225, 297 (1988), <u>cert. denied</u>, 488 U.S. 1017, 109 S.Ct. 813, 102 L. Ed.2d 803 (1989)). A defendant has a "right to introduce evidence of third-party guilt 'if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" <u>State v. Cotto</u>, 182 N.J. 316, 332 (2005) (quoting <u>Fortin</u>, <u>supra</u>, 178 N.J. at 591).

"However, a defendant cannot simply seek to introduce evidence of 'some hostile event and leave its connection with the case to mere conjecture.'" <u>Id.</u> at 333 (quoting <u>State v. Sturdivant</u>, 31 N.J. 165, 179 (1959), <u>cert. denied</u>, 362 U.S. 956, 80 S.Ct. 873, 4 L. Ed.2d 873 (1960)). Consequently, a defendant must establish "some link between the third-party and the victim or the crime." <u>Ibid.</u> (quoting <u>Koedatich</u>, <u>supra</u>, 112 N.J. at 301). The trial judge had "broad discretion to admit or preclude evidence of third-party guilt." Ibid. (citing <u>Fortin</u>, <u>supra</u>, 178 N.J. at 591; <u>Koedatich</u>, <u>supra</u>, 112 N.J. at 300). We consider defendant's claim of error under an abuse of discretion standard. <u>Ibid.</u> (citing <u>Fortin</u>, <u>supra</u>, 178 N.J. at 591).

Here, L.J.'s mother testified at the N.J.R.E. 104 hearing that L.J. was involved with a street gang called the "Clinton Avenue Posse." T.J. recounted that L.J. had a fight with someone about three months before he was killed. However, she stated that L .J. had never expressed any concern for his safety and never indicated that he needed protection. T.J. additionally testified that she did not know whether L.J. had any enemies and, to her knowledge, he had never been threatened by anyone. In our view, the judge correctly found that T.J.'s testimony failed to establish the requisite factual connection between L.J.'s "gang-involvement" and his murder.

We reach the same conclusion with regard to the proffered testimony of L.J.'s sister, S.T.J. She testified at the N.J.R.E. 104 hearing that L.J. had some involvement or association with the "Clinton Avenue Posse." S.T.J. said that L.J. had "problems" with a member of the "Sixth Street Gang." S.T.J. asserted that the members of these two groups "didn't

like each other." S.T.J. testified that in October
2002, a member of the "Sixth Street Gang" had a fight
with L.J. and beat him in the face with a flashlight.
S.T.J. stated that she told the police that this
individual had gone "around town saying" he did not
like L.J. However, S.T.J. testified that she did not
know of any specific threats to L.J. from anyone. The
record supports the judge's finding that the proffered
testimony failed to establish the required factual
link between L.J.'s gang involvement and his murder.

The same conclusion applies to the proffered
testimony from S.C. She testified at the N.J.R.E. 104
hearing that L.J. was "affiliated" with the "Clinton
Avenue Posse." She described this group as a "bunch of
kids [who] stayed on the same street." S.C. did not
consider the "Clinton Avenue Posse" a street gang;
however, she said that members of this group had
disputes with certain persons that "hung out" in the
"Projects."

S.C. additionally testified that L.J. sold drugs
and carried a knife most of the time. L.J. also
carried a gun on occasion. S.C. knew that L.J.
possessed several guns. S.C. said that she was
concerned about someone wanting to hurt L.J. because a
"guy" in her class at school said that "they" would
"bump him," meaning "kill him." S.C. did not interpret
this as a threat because the person who made this
remark did not know L.J. personally and only made the
comment because he knew of L.J.'s "reputation on the
street."

S.C. agreed that it was known "on the street"
that L.J. had money because he dressed in "fancy
clothes" and had jewelry. However, S.C. admitted that
she never heard anyone threaten L.J. She said that she
knew that an individual with the "Sixth Street" group
had a fight with L.J. But, L.J. never told S.C. that
this person had threatened him. S.C. said that, to her
knowledge, no one from the "Sixth Street" group had
ever threatened L.J. She also said that she did not
know of any threats by anyone in other groups, such as
the group in the "Projects." We are satisfied that the
trial judge correctly found that S.C. proffered
testimony did not establish the requisite factual link
between possible third-party guilt and L.J.'s murder.

        In sum, we are convinced that the trial judge did
    not abuse his discretion by denying defendant's
    application to admit the proffered testimony of L.J.'s
    "gang-involvement" to establish possible third-party
    guilt.

2007 WL 2935055 at *6-*8.

    As noted above, for a habeas petitioner to prevail on a

claim that an evidentiary error amounted to a deprivation of due

process, he must show that the error was so pervasive as to have

denied him a fundamentally fair trial.  Keller v. Larkins, 251

F.3d at 413.  In addition, pursuant to the Sixth Amendment, "In

all criminal prosecutions, the accused shall enjoy the right ...

to be confronted with the witnesses against him; [and] to have

compulsory process for obtaining witnesses in his favor."

However, "'state and federal rulemakers have broad latitude

under the Constitution to establish rules excluding evidence

from criminal trials.'"  Homes v. South Carolina, 547 U.S. 319,

324 (2006) (quoting United States v. Scheffer, 523 U.S. 303, 308

(1998); also citing Crane v. Kentucky, 476 U.S. 683, 689-690

(1986); Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983);

Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973); and

Spencer v. Texas, 385 U.S. 554, 564 (1967)).

        This latitude, however, has limits.  "Whether
    rooted directly in the Due Process Clause of the
    Fourteenth Amendment or in the Compulsory Process or
    Confrontation clauses of the Sixth Amendment, the
    Constitution guarantees criminal defendants 'a
    meaningful opportunity to present a complete

defense.'" This right is abridged by evidence rules
that "infring[e] upon a weighty interest of the
accused" and are "'arbitrary' or 'disproportionate to
the purposes they are designed to serve.'"

   ...

    While the Constitution thus prohibits the
exclusion of defense evidence under rules that serve
no legitimate purpose or that are disproportionate to
the ends that they are asserted to promote, well-
established rules of evidence permit trial judges to
exclude evidence if its probative value is outweighed
by certain other factors such as unfair prejudice,
confusion of the issues, or potential to mislead the
jury. ...  Plainly referring to rules of this type, we
have stated that the Constitution permits judges "to
exclude evidence that is 'repetitive ..., only
marginally relevant' or poses an undue risk of
'harassment, prejudice, [or] confusion of the
issues.'"  See also Montana v. Egelhoff, 518 U.S. 37,
42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality
opinion) (terming such rules "familiar and
unquestionably constitutional").

Homes v. South Carolina, 547 U.S. at 324-25 (citations omitted).

    Violations of the right to present a defense are subject to

harmless error review.  See, e.g., Crane v. Kentucky, 476 U.S.

683 (1986); Delaware v. Van Arsdall, 475 U.S. 673, 680-84

(1986); Savage v. District Attorney of the County of

Philadelphia, 116 F.App'x 332 (3d Cir. 2004) (unpubl.).

    The Compulsory Process clause protects the
presentation of the defendant's case from unwarranted
interference by the government, be it in the form of
an unnecessary evidentiary rule, a prosecutor's
misconduct, or an arbitrary ruling by the trial judge.
...

    But the right is not absolute.  The Sixth
Amendment requires more than a mere showing by the
accused that some relevant evidence was excluded from

his trial.  Rather, the accused must show how that testimony would have been both <u>material</u> and <u>favorable</u> to his defense. ... [E]vidence is material: "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."  ...  In [<u>United States v. ]Bagley</u>, [473 U.S. 667 (1985), ]the Court further refined the materiality definition by noting that, "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383.

In sum, for [a defendant] to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: first, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose. <u>Rock v. Arkansas</u>, 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).

<u>Government of the Virgin Islands v. Mills</u>, 956 F.2d 443, 445-46 (3d Cir. 1992) (footnote omitted).  The Court of Appeals noted that there is little, if any, difference in the analysis of such a claim under the Sixth Amendment or under the Due Process Clause.  <u>Mills</u>, 956 F.2d at 445 n.4, <u>cited in</u> U.S. v. Bianchi, 386 F.App'x 156, 159 n.5 (3d Cir. 2010), <u>cert. denied</u>, 131 S.Ct. 1044 (2011).

Here, the Appellate Division found no abuse of discretion in the trial court's exclusion of evidence regarding the victim's possible gang involvement.  This Court agrees that the decision to exclude the evidence of gang involvement was not arbitrary, but was rationally based upon Petitioner's failure to

23

provide a factual link between the victim's gang activities and the circumstances of his death.  Moreover, this Court agrees that the excluded evidence was not material to the issue of Petitioner's guilt, but was merely conjectural.  Accordingly, Petitioner is not entitled to relief with respect to this claim.

C.    Prosecutorial Misconduct in Closing

Petitioner argues that the prosecutor deprived him of a fair trial by commenting, in closing argument, about the possibility that Petitioner had authored notes to T.J. and Martin, without having first presented an expert witness to testify that the notes were written by Petitioner.[2]   In his remarks, the prosecutor pointed to specific similarities between Petitioner's known handwriting exemplars and the two notes that were purportedly written by him.  Again, the Appellate Division rejected this argument on direct appeal.

> In addition, defendant contends that the prosecutor improperly compared defendant's handwriting with the writing on a note that he "purportedly" wrote to Martin.  Defendant contends that expert testimony was required to support the prosecutor's comments.

---

[2] In his brief on direct appeal, Petitioner challenged the prosecutor's references with respect to both notes.  (Answer, Ex. Ra1 at 37-40.)  Accordingly, he has exhausted his claim with respect to both notes.  In its opinion, however, the Appellate Division referred only to the prosecutor's comments regarding Petitioner's purported note to Martin.  As the analysis is applicable to the comments regarding both notes, this Court will resolve this claim, in its entirety, based on the Appellate Division's decision regarding the comments made by the prosecutor with respect to the note to Martin.

Improper comments by a prosecutor will not
warrant reversal of a conviction unless the remarks
were "so egregious as to deprive defendant of a fair
trial." State v. Timmendequas, 161 N.J. 515, 575
(1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151
L.Ed.2d 89 (2001).

In determining whether a prosecutor's comments
were sufficiently egregious to deny defendant a
fair trial, we consider the tenor of the trial
and the responsiveness of counsel and the court
to the improprieties when they occurred.

Generally, if no objection was made to the
improper remarks, the remarks will not be deemed
prejudicial. Failure to make a timely objection
indicates that defense counsel did not believe
the remarks were prejudicial at the time they
were made. Failure to object also deprives the
court of the opportunity to take curative action.

[Id. at 575-76.]

Here, defense did not object to the prosecutor's
remarks at the time they were made. This is
understandable because there was nothing objectionable
about the comments.

...

Furthermore, there was nothing improper about the
prosecutor's comparison of the handwritings. Again,
this was fair comment on the evidence, and expert
testimony was not required to support the prosecutor's
remarks. See State v. Carroll, 256 N.J. Super. 575,
593-98 (App. Div.), certif. denied, 130 N.J. 18 (1992)
(holding that it was not error to allow jury to make a
comparison of handwriting samples without expert
testimony).

2007 WL 2935055 at *9-*10.

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

> He may prosecute with earnestness and vigor – indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is
> to use every legitimate means to bring about a just
> one.  ...  Consequently, improper suggestions,
> insinuations, and, especially, assertions of personal
> knowledge are apt to carry much weight against the
> accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935), cited in Cone v. Bell, 556 U.S. 449, 469 (2009).

As a general rule, under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  See also Parker v. Matthews, 132 S.Ct. 2148, 2153 (2012) (noting that the "clearly established Federal law" relevant to a habeas challenge to a prosecutor's closing remarks is the holding set forth in Darden, in reliance on Donnelly).  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, the Appellate Division found no error under state law in the prosecutor's comparisons of Petitioner's known handwriting exemplars with the handwriting of the note to Martin.  As state law permits the jury to determine whether the handwriting was Petitioner's, the prosecutor's comments on the issue, in which he directed the jury to look at particular similarities between the handwriting in the notes and the known exemplars, were fair comment on the evidence.  Certainly, in light of the quantum of evidence against Petitioner, it cannot be said that the comments on the handwriting infected the trial with unfairness.  Petitioner is not entitled to relief on this claim.

D.   Challenge to Sentence

Petitioner claims that the trial court abused its discretion, and violated State v. Natale, in imposing the 60-year NERA sentence, which Petitioner also claims is excessive. The Appellate Division found no error in the sentencing.

> Defendant raises several issues with respect to his sentences. The judge found aggravating factors under N.J.S.A. 2C:44-1a(1) (nature and circumstances of the offense, including whether it was especially heinous or cruel); N.J.S.A. 2C:44-1a(2) (gravity and seriousness of harm inflicted on the victim); N.J.S.A. 2C:44-1a(3) (risk that defendant will commit another offense); N.J .S.A. 2C:44-1a(6) (extent of defendant's prior record and the seriousness of the offenses of which he had been convicted); and N .J.S.A. 2C:44-1(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

On count one (murder), the judge imposed a sixty-year term of incarceration, with a period of parole ineligibility as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The same sentence was imposed on count two (felony murder), to run concurrent to the sentence imposed on count one. The judge merged counts three (robbery) and five (possession of a firearm for an unlawful purpose) with count four (unlawful possession of a weapon) and imposed a flat, four-year sentence, concurrent to the sentences imposed on counts one and two.

Defendant contends that the sixty-year sentence for murder is manifestly excessive, constitutes an abuse of discretion and violates State v. Natale, 184 N.J. 458 (2005). We disagree. The sentence imposed on count one is not unduly punitive or an abuse of the judge's sentencing discretion, and the sentence does not shock the judicial conscience. State v. O'Donnell, 117 N.J. 210, 215-16 (1989); State v. Roth, 95 N.J. 334, 363-65 (1984).

Defendant additionally argues that the sixty-year sentence on count one violates Natale. The contention is entirely without merit. The principles set forth in Natale do not apply to sentences for murder because there is no presumptive term for that offense. See State v. Abdullah, 184 N.J. 497, 507 (2005).

State v. Starr, 2007 WL 2935055 at *10.

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." See Grecco v. O'Lone, 661, F.Supp. 408, 415 (D.N.J. 1987) (citation omitted). Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation. See Pringle v.

Court of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984).  See
also 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67
(1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  Here,
Petitioner has raised two such challenges:  (1) that the
sentence is excessive and (2) that the sentence was imposed in
violation of his Sixth Amendment right to trial by jury.

    "The Eighth Amendment, which forbids cruel and unusual
punishments, contains a 'narrow proportionality principle' that
'applies to noncapital sentences.'" Ewing v. California, 538
U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has
identified three factors that may be relevant to a determination
of whether a sentence is so disproportionate to the crime
committed that it violates the Eighth Amendment:  "(1) the
gravity of the offense and the harshness of the penalty; (ii)
the sentences imposed on other criminals in the same
jurisdiction; and (iii) the sentences imposed for commission of
the same crime in other jurisdictions." Solem v. Helm, 463 U.S.
277, 292 (1983).  More recently, Justice Kennedy has explained
that Solem does not mandate comparative analysis within and
between jurisdictions, see Harmelin v. Michigan, 501 U.S. 957,
1004-05 (1991) (Kennedy, J., concurring in part and concurring
in judgment), and he has identified four principles of
proportionality review--"the primacy of the legislature, the
variety of legitimate penological schemes, the nature of our

29

federal system, and the requirement that proportionality review be guided by objective factors"--that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime,"  id. at 1001 (citation omitted) quoted with approval in Ewing, 538 U.S. at 23.  Here, it cannot be said that a 60-year sentence is grossly disproportionate to the crime of murder.  Petitioner is not entitled to relief on this claim.

Petitioner also has argued that the sentence violates his due process rights and his Sixth Amendment right to trial by jury, in violation of the rule set forth in State v. Natale.

In Apprendi v. New Jersey, 530 U.S. 466, 471, 490 (2000), pursuant to the Fourteenth Amendment right to due process, coupled with the Sixth Amendment right to trial by jury, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court overturned a sentence imposed under Washington state's sentencing system, explaining that "the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional

findings." 542 U.S. at 302 (internal quotations omitted). More specifically, "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis in original) (citations omitted). Most recently, in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court applied the rule of Apprendi to the United States Sentencing Guidelines, finding the Guidelines unconstitutional, and rendering them merely advisory, rather than mandatory.

In State v. Natale, 184 N.J. 458 (N.J. 2005), the Supreme Court of New Jersey evaluated the constitutionality of the New Jersey sentencing scheme in light of the Apprendi line of cases.

> Our Code provisions make clear that, before any judicial factfinding, the maximum sentence that can be imposed based on a jury verdict or guilty plea is the presumptive term. Accordingly, the "statutory maximum" for Blakely and Booker purposes is the presumptive sentence.

Natale, 184 N.J. at 484. Because the New Jersey Code's system allowed for sentencing beyond the statutory maximum presumptive term, the Supreme Court of New Jersey found the state sentencing system unconstitutional and determined that the appropriate remedy would be to follow the lead of Booker and abolish the presumptive terms. "Without presumptive terms, the 'statutory maximum' authorized by the jury verdict or the facts admitted by

a defendant at his guilty plea is the top of the sentencing range for the crime charged, e.g., ten years for a second-degree offense." Natale, 184 N.J. at 487 (citation omitted). The Supreme Court of New Jersey held that the rule it announced in Natale was applicable retroactively only to cases in the direct appeal pipeline as of the date of that decision, August 2, 2005. Natale, 184 N.J. at 494. Thus, it would have applied to Petitioner, who was sentenced only days before.

Here, however, the Appellate Division found that there was no Natale violation, because there was no presumptive sentence for murder. Accordingly, there has been no Apprendi/Blakely/Booker violation.

Moreover, the Court of Appeals for the Third Circuit generally has held that the rules announced in the Apprendi line of cases are not applicable retroactively to cases on federal collateral review. See generally In re Olopade, 403 F.3d 159 (3d Cir. 2005) (finding that Booker does not apply retroactively to cases on collateral review); United States v. Swinton, 333 F.3d 481 (3d Cir.), cert. denied, 540 U.S. 977 (2003) (holding that Apprendi does not apply retroactively to cases on collateral review). Thus, here, whether or not the sentence was imposed in violation of the rules announced in the Apprendi/Natale line of cases, Petitioner is not entitled to relief in this federal collateral proceeding.

E.    Ineffective Assistance of Counsel

     After Respondents filed their Answer, Petitioner sent this

Court a Letter [20], which reads as follows, in its entirety:

          I am writing in reference to my habeas corpus
     petition.  Due to my lack of knowledge on how to raise
     more than four issues for my petition, I stapled my
     most relevant issue to the petition but it was not
     heard in the respondent's response to my petition.  I
     strongly ask your Honor to please allow me to raise
     this ineffective assistance of counsel issue.

(Letter, Doc. No. 20.)  Petitioner did not further describe the

proposed ineffective assistance issue, but the Court notes that

Petitioner did affix to his Petition an attachment, which was

labelled a response to Question 11 on the form habeas corpus

petition, relating to claims raised in state court petitions for

post-conviction relief, and which reads as follows:

          HAVING DECIDED ON A THIRD PARTY GUILT DEFENSE AND
     HAVING THE THEORY OF GANG INVOLVEMENT REJECTED BECAUSE
     IT WAS SPECULATIVE THAT ANY IDENTIFIED PARTY WAS EVEN
     IN THE NEIGHBORHOOD AT THE TIME OF THE CRIME, TRIAL
     COUNSEL RENDERED INEFFECTIVE AND PREJUDICIAL
     ASSISTANCE BY NOT CLAIMING THAT "C.J.," (the visitor)
     at 3:30am, to decedent Leonard James, who asked
     Leonard James for something (mostly drugs) but was
     denied, had returned to the James home early in the
     morning of the murder.  AND ENTERED THE HOUSE AND
     COMMITTED THE MURDER AND ROBBERY AFTER PETITIONER HAD
     LEFT.

(Petition, Doc. No. 1, Att.)  Thus, the Court construes

Petitioner's Letter as referring to this claim.  As noted above,

Respondents have not responded to Petitioner's Letter.

     To the extent the Petition could be construed as having

33

asserted the ineffective assistance claim referenced above, the Court notes that the claim was exhausted, and rejected, in state court.

To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate a reasonable likelihood of success under the test set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984). Under the first prong of the Strickland test, a defendant must show that defense counsel's performance was deficient. Ibid. Under the second prong, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698. The two-part test set forth in Strickland was adopted by this State in State v. Fritz, 105 N.J. 42, 58 (1987).

In demonstrating that counsel's performance was deficient under the first prong of Strickland, a defendant must overcome "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Fritz, supra, 105 N.J. at 52 (quoting Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694). Further, because prejudice is not presumed, id. at 52, a defendant must demonstrate "how specific errors of counsel undermined the reliability" of the proceeding. United States v. Cronic, 466 U.S. 648, 659 n. 26, 104 S.Ct. 2039, 2047 n. 26, 80 L. Ed.2d 657, 668 n. 26 (1984).

III.

Starr argues that the trial judge should have held an evidentiary hearing to consider his argument that his trial counsel was ineffective because he did not focus the defense on C.J. as the third-party killer. In denying the petition, the trial judge concluded there was an insufficient basis for the proposed defense because Starr had not satisfied the requirements of State v. Sturdivant, 31 N.J. 165, 179 (1959), cert. denied, 362 U .S. 956, 80 S.Ct. 873, 4 L. Ed.2d 873 (1960), with respect to the quality of

the evidence of third-party guilt. In addition, he concluded that, even if the defense should have been pursued, it would not have been successful. We agree.

A defendant is "entitled to prove his innocence by showing that someone else committed the crime." State v. Koedatich, 112 N .J. 225, 297 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L. Ed.2d 803 (1989). Accordingly, a defendant may introduce probative evidence of a third-party's guilt. Id. at 297-98. In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L. Ed.2d 297 (1973), the Supreme Court stated that an accused has a constitutional right under the due process clause of the Fourteenth Amendment to offer evidence of third-party guilt.

The standard adopted by our Supreme Court governing the admissibility of evidence of third-party guilt was set forth in Sturdivant, as follows:

> A defendant of course may seek to prove that another agency produced the death with which he is charged. It would seem in principle to be sufficient if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.
>
> ....
>
> We think it not enough to prove some hostile event and leave its connection with the case to mere conjecture. Somewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case. The question of relevancy ultimately rests in a sound exercise of discretion.
>
> [Sturdivant, supra, 31 N.J. at 179.]

The trial testimony established that C.J. left the murder scene at approximately 3:30 a.m., after which the door had been locked. There was no evidence that he returned to commit the murder, which took place several hours later. Starr's argument with respect to C.J.'s supposed guilt was the type of "mere

conjecture" precluded by <u>Sturdivant</u>. In contrast, there was considerable evidence that Starr had the opportunity to commit the murder, after which he was seen with a sweat suit and gold chain belonging to L.J. He also admitted the killing to a cellmate. Thus, even if Starr's defense had focused on C.J. as the perpetrator, there is no reason to believe that the jury would have acquitted him.

Consequently, Judge Heimlich correctly concluded that neither prong of the <u>Strickland</u> test had been satisfied. Without a prima facie case of ineffective assistance, no hearing was required.

<u>State v. Starr</u>, 2011 WL 1135116 at *6-*7.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added) (citations omitted), <u>cited in</u> <u>Ross v. Varano</u>, 712 F.3d 784, 797 (3d Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  With respect to the "performance" prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." _Strickland_, 466 U.S. at 689.  With

respect to the "prejudice" prong, a "reasonable probability" of

prejudice is "a probability sufficient to undermine confidence

in the outcome." _Strickland_ at 694.  Thus, counsel's errors

must have been "so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable." _Id._ at 687.  "When a

defendant challenges a conviction, the question is whether there

is a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt."

_Id._ at 695.  The performance and prejudice prongs of _Strickland_

may be addressed in either order, and "[i]f it is easier to

dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice ... that course should be followed."  _Id._

at 697.

The Supreme Court has recently emphasized the deferential

nature of federal habeas review of state court decisions

applying the _Strickland_ standard.

> Establishing that a state court's application of
> _Strickland_ was unreasonable under § 2254 is all the
> more difficult.  The standards created by _Strickland_
> and § 2254 are both "highly deferential," and when the
> two apply in tandem, review is "doubly" so.  The
> _Strickland_ standard is a general one, so the range of
> reasonable applications is substantial.  Federal
> habeas courts must guard against the danger of
> equating unreasonableness under _Strickland_ with
> unreasonableness under § 2254.  When § 2254 applies,
> the question is not whether counsel's actions were
> reasonable.  The question is whether there is any
> reasonable argument that counsel satisfied

37

<u>Strickland</u>'s deferential standard.

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 788 (2011) (citations omitted).

Here, the Appellate Division reasonably found that Petitioner's argument regarding C.J.'s supposed guilt was "mere conjecture" and that, in any event, the evidence against Petitioner was so substantial that there was no reason to find that the jury would have acquitted Petitioner even if his counsel had put forth an argument that C.J. was responsible for the crime.  This Court agrees that Petitioner has failed to satisfy either prong of the <u>Strickland</u> standard.  Petitioner is not entitled to relief on this claim.

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003)

(citation omitted), <u>cited in</u> <u>Eley v. Erickson</u>, 712 F.3d 837, 845 (3d Cir. 2013).

Here, jurists of reason would not disagree with this Court's resolution of Petitioner's claim.  No certificate of appealability shall issue.

## V.   CONCLUSION

For the reasons set forth above, this Court finds that the decisions of the Appellate Division were neither contrary to nor an unreasonable application of clearly established federal law. In addition, this Court finds that the decisions of the Appellate Division were based on a reasonable determination of the facts in light of the evidence presented.  The Petition shall be denied.  An appropriate order follows.



/s/ Dickinson R. Debevoise
Dickinson R. Debevoise
United States District Judge

Dated:  April 7, 2014